# Exhibit 32



June 6, 2025

Andrew R Little
2729 Royenwood Rd
Midlothian, VA 23113

US District Court
Eastern District of Virginia
Honorable David J. Novak
701 East Broad Street
Richmond, VA 23219

Re:   Case NO:  3:24-cr-00152; Chis Harrison Sentencing

Dear Judge Novak:

I am writing to provide more detailed background and context related to Chris Harrison's involvement in the Model Tobacco and Whitaker Park projects, and about correspondence between Chris Harrison and myself.

In any multifamily construction project, the developer sets out in the beginning to determine a reasonable budget.  The budget has specific line items that relate to the general contractor, the site contractor, the architect and engineers and if it is separately contracted, the demolition work.  Both the Model Tobacco and Whitaker Park projects were historic rehabilitations, and there was a separate line item in each budget related to the demolition work.  This is not uncommon because demolition on historic rehabilitation is very important and if it goes wrong, it can ruin the ability to obtain the historic tax credits.

In the Whitaker Park project, there was an allocation for demolition in the budget.  Chris determined that he could not only hire his own subcontractors and complete the work at the most efficient price but also oversee their work to make sure nothing was taken out of the building that would hurt the ability of the project to obtain historic tax credits.  This is time-consuming work with a lot of responsibility, and Chris was entitled to a fee for this work.

The demolition work that Chris supervised and took a fee for was in line with the market rates for such work.  Chris's performance and supervision of the demolition work also gave him a degree of control over how the work was performed, to make sure the work was performed properly. Chris's work ensured that the project avoided the loss of valuable tax credits.  I did not view it as a scheme to siphon money off the project.

The issue that I was addressing in my correspondence with Chris was not to question his taking a profit on the demolition.  Instead, Chris did not communicate well with his partners. He just did the demolition work without telling Bart Frye or myself that he was operating as the demolition contractor.  When we later learned he did the work himself, Bart lost some trust in Chris and this contributed to disagreements between them. I viewed this email as a matter of communication and trust between partners.  If Chris had

communicated his intent up front and showed us the competitive bids, we would have agreed to it. As it turned out, the rate for Chris's demolition work was in-line with the market rates for such work.

Many general contractors and developers self-perform work if they believe they can do it at a reasonable market price, and they make a fee on that self-performed work. To some degree, all contractors use subcontractors. A general contractor is a prime example — they get paid a fee to oversee all the subcontractors and run the job. With a historic tax credit job, you would have to have someone overseeing the demolition work that knew what could be taken and make sure no one ruined the eligibility of the project.

The overall fee must be reasonable and budgeted and, in the case of construction draws, both the budget and the work is inspected by a third-party consultant, who ensures the budget and work is reasonable. In the case of historic rehabilitation, there are also large contingencies that can arise, because issues come up in demolition that no contractor can predict until they start tearing down walls.

The other issue I want to address is the structure of the partnership at Model Tobacco. It was somewhat unusual to have partners involved that had power over major decisions, but did not have their personal signature on any guarantees. This came up as an issue when we first tried to close the loan in December of 2019. The tax credit investor backed out at the last minute because not all the partners who had decision-making capability were willing to guarantee the tax credits. This forced Chris at the last minute to find a different tax credit investor. Chris ultimately found a different tax credit investor and we ended up closing nine months later, after COVID had changed the timeline of the project.

That investor foresaw what has become the issue here. The civil charges filed and publicized by these other investors against Chris effectively doomed the project. Those charges exposed a rift in the partnership that became grounds for the tax credit investor to stop funding the deal. Had the tax credit investor funded the deal, Cedar Rapids Bank & Trust would have been paid back.

The fact that the partners were not aligned in a joint guarantee of the Cedar Rapids loan (and tax credits) created a scenario where they didn't need to work out their differences amicably. The civil charges also made it virtually impossible for Chris to bring in a new partner to buy out the old partners. This disagreement amongst the partners is a shame, because the Model Tobacco Project is actually quite a good development.

Sincerely,

Andrew R Little
Managing Principal
Queenswood Partners, LLC